UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

BRIDGEPORT MUSIC, INC., et al., )
                                )
          Plaintiffs,           )
                                )
          v.                    )  NO.  3:01-0758
                                )  **Jury Demand**
ESTATE OF TUPAC SHAKUR, et al., )  Judge Campbell/Brown
                                )
          Defendants.           )

BRIDGEPORT MUSIC, INC., et al., )
                                )
          Plaintiffs,           )
                                )
          v.                    )  NO.  3:01-0991
                                )  **Jury Demand**
AUJOURDHUI PUBLISHING CO.,      )  Judge Campbell/Brown
et al.,                         )
                                )
          Defendants.           )

BRIDGEPORT MUSIC, INC., et al., )
                                )
          Plaintiffs,           )
                                )
          v.                    )  NO.  3:01-0992
                                )  **Jury Demand**
GEORGE CLINTON, et al.,         )  Judge Campbell/Brown
                                )
          Defendants.           )

To: The Honorable Todd J. Campbell, District Judge

## REPORT AND RECOMMENDATION

### I.  INTRODUCTION

Currently pending are motions to enforce a settlement
agreement in three civil actions: Case Number 3:01-0758 (Docket
Entry No. 121), Case Number 3:01-0991 (Docket Entry No. 95), and
Case Number 3:01-0992 (Docket Entry No. 81).  The moving papers

1

in the three cases are nearly identical and oral argument on all three motions was conducted in a single hearing on May 16, 2006.

Case Number 3:01-0758 involves Plaintiff Bridgeport Music, Inc. ("Bridgeport") and Defendant Stephanie Clinton d/b/a Goosehock Music ("Goosehock") and relates to a claim of copyright infringement on a work titled "(Not Just) Knee Deep" by a work titled "Can't C Me."

Case Number 3:01-0991 involves Plaintiffs Bridgeport and Southfield Music, Inc. ("Southfield") and Defendant George Clinton d/b/a Exoskeletal Music ("Exoskeletal") and relates to a claim of copyright infringement by a work titled "Martial Law."

Case Number 3:01-0992 involves Plaintiff Bridgeport and Defendants George Clinton d/b/a Exoskeletal and Tick Free Music ("Tick Free") and relates to a claim of copyright infringement on a work titled "The Humpty Dance" by a work titled "Mathematics."

The Plaintiffs have filed two additional documents in support of their motion: (1) a memorandum of law (Case No. 3:01-0758, Docket Entry No. 122; Case No. 3:01-0991, Docket Entry No. 96; Case No. 3:01-0992, Docket Entry No. 82) and (2) the declaration of lead Plaintiffs' attorney Ramona P. DeSalvo ("DeSalvo") (Case No. 3:01-0758, Docket Entry Nos. 123-24; Case No. 3:01-0991 Docket Entry No. 97; Case No. 3:01-0991, Docket Entry No. 83).

2

The Defendants have filed four documents[1] in support of their opposition to the Plaintiffs' motion: (1) a memorandum of law (Case No. 3:01-0758, Docket Entry No. 125; Case No. 3:01-0991 Docket Entry No. 98; Case No. 3:01-0992, Docket Entry No. 84); (2) the declaration of lead local defense attorney C. Bennett Harrison ("Harrison") (Case No. 3:01-0758, Docket Entry No. 126; Case No. 3:01-0991, Docket Entry No. 99; Case No. 3:01-0992, Docket Entry No. 85); (3) the declaration of former defense attorney Janet Conway ("Conway") (Case No. 3:01-0758, Docket Entry No. 127; Case No. 3:01-0991, Docket Entry No. 100; Case No. 3:01-0992, Docket Entry No. 87); and (4) the declaration of lead out-of-state defense attorney J. Bowman Neely ("Neely") (Case No. 3:01-0758, Docket No. 128; Case No. 3:01-0991, Docket Entry No. 101; and Case No. 3:01-0992, Docket Entry No. 87).

For the reasons set forth below, the Magistrate Judge recommends that the Plaintiffs' Motion to Enforce Settlement Agreement be **GRANTED** in Case Number 3:01-0758 and Case Number 3:01-0991 and be **DENIED** in Case Number 3:01-0992.

---

[1]The Defendants also belatedly filed a supplemental brief at the request of the Magistrate Judge. (Case No. 3:01-0758, Docket Entry No. 130; Case No. 3:01-0991, Docket Entry No. 103; Case No. 3:01-0992, Docket Entry No. 89.) While this document has been reviewed and considered, the Magistrate Judge advises that this brief is only pertinent to Case No. 3:01-0992, and does not affect the conclusions of law contained herein with regard to that case.

3

## II. BACKGROUND

This motion is a part of a case which dates back to May 4, 2001, when Plaintiffs filed a prodigious complaint against nearly eight hundred defendants. The case was severed into 475 separate actions. In 2003, the United States Court of Appeals for the Sixth Circuit heard an appeal on one of the severed cases, and on July 17, 2003, Judge Todd J. Campbell entered orders to stay the proceedings in the three cases at bar pending the Sixth Circuit decision. (Case No. 3:01-0758, Docket Entry No. 70; Case No. 3:01-0991, Docket Entry No. 46; Case No. 3:01-0992, Docket Entry No. 33.) The Sixth Circuit entered its decision on September 7, 2004, Bridgeport Music, Inc. v. Dimension Films, 383 F.3d 390 (6th Cir. 2004), aff'd on reh'g, 401 F.2d 647 (6th Cir. 2004), and Judge Campbell accordingly lifted the stay on October 4, 2004. (Case No. 3:01-0758, Docket Entry No. 74; Case No. 3:01-0991, Docket Entry No. 50; Case No. 3:01-0992, Docket Entry No. 37.)

Conway gave official notice of her withdrawal as counsel on July 12, 2005, (Case No. 3:01-0758, Docket Entry No. 86; Case No. 3:01-0991, Docket Entry No. 59; Case No. 3:01-0992, Docket Entry No. 46), and an order was entered by Judge Campbell approving the withdrawal on August 31, 2005.[2] (Case No. 3:01-0991, Docket

---

[2]During the course of this litigation Conway was lax in keeping a current address on file with the court.

4

Entry No. 61; Case No. 3:01-0992, Docket Entry No. 53.) Though DeSalvo's declaration states that she entered into settlement negotiations with Conway before Conway was released from the cases, (Case No. 3:01-0758, Docket Entry No. 123 at 3), in her declaration and at oral argument, DeSalvo confirmed that she had not reached an agreement with Conway. (See id.) Therefore, the pertinent settlement discussions for purposes of this motion begin with Harrison's and DeSalvo's initial correspondence on June 24, 2005. (Id. at 3, 19-20.)[3]

In the course of Harrison's and DeSalvo's settlement negotiations, Case No. 3:01-0931, regarding a work titled "If Anybody Gets Funked Up," and Case No. 3:01-1136, regarding a work titled "Underground Angel," were also discussed. (Id. at 22-24.) Because these cases are unrelated to the motions at hand, and because the settlement negotiations are clearly divisible, as they involve five separate cases and all negotiations were organized by case number, (id.), the negotiations surrounding Case No. 3:01-0931 and Case No. 3:01-1136 will not be discussed.

A. The Start of Negotiations

On June 28, 2005, DeSalvo sent an e-mail to Harrison with the subject line "RE: 991/992/758," referring to the case numbers

_____

[3]This report will primarily cite to DeSalvo's declaration for the negotiations between attorneys, though the same information is included in the attachments to Harrison's and Neely's declarations.

5

which are the subject matter of these motions. (<u>Id.</u> at 19.) In this initial e-mail, DeSalvo asserted that for an "interpolation of [Bridgeport's song] '(Not Just) Knee Deep'" in the song "Can't C Me," "George Clinton took a 25% share as a songwriter and Goosehock took a 25% publishing share." (<u>Id.</u>) Because of this, to settle Case No. 3:01-0758, Bridgeport "demand[ed] that 25% writer's and 25% publisher's share for the use of Bridgeport's copyright," while acknowledging that George Clinton "may have to go to his co-publishers to get the share." (<u>Id.</u> at 19-20.)

DeSalvo also "demand[ed] a 50% publishing share (writer and publisher) on a [most favored nations[4]] basis" for Bridgeport in Case No. 3:01-0992, for a sample of Bridgeport's song "The Humpty Dance" in the song "Mathematics." (<u>Id.</u> at 19)

In this e-mail, DeSalvo did not include a proposal on Case No. 3:01-0991. (<u>Id.</u> at 20.) However, two days later, on June 30, 2005, DeSalvo sent an e-mail which "request[ed] that [George Clinton d/b/a Exoskeletal] sign the co-publishing agreement (Release and Agreement) for ['Martial Law']" with specifically enumerated splits for each of six different songs allegedly sampled, ten different writers (including George Clinton Jr. at 30.35% and George Clinton III at 9%), and seven different

---

[4]As will be explained more thoroughly in Section III(C)(2), a "most favored nations" clause in the music publishing context generally means that if another publisher or song receives a more favorable royalty rate, the party with the "most favored nations" clause will also receive the benefit of such rate.

publishers (including Bridgeport at 76%, Southfield at 14%, and Exoskeletal at 0%).  (Id. at 19.)

B.  Negotiations Surrounding Case No. 3:01-0758

Harrison responded to this offer on July 12, 2005 by e-mail and U.S. mail.  (Id. at 22.)  In this correspondence, Harrison made four points with regard to Case No. 3:01-0758: (1) that a demand for songwriter credits from George Clinton was improper because only Stephanie Clinton d/b/a Goosehock is a defendant in the case; (2) that the de minimus exception should apply to this case because the portion used is an interpolation of Bridgeport's song "(Not Just) Knee Deep," which is "almost indecipherable and surely insignificant;" (3) that George Clinton's 25% share was "the result of his original contribution to the song," not the interpolation, as the interpolation was inserted by Tupac Shakur, with whom Bridgeport has previously settled; and (4) that an expert would be needed to prove the existence of an interpolation, and the deadline for disclosure of experts had passed.  (Id. at 23.)  For those reasons, Harrison refused to offer DeSalvo's client "any portion of either the songwriter or publishing interest" in "Can't C Me."  (Id.)

On that same day, July 12, 2005, DeSalvo responded by quoting from what she asserted to be notes taken during negotiations with Conway.  (Id. at 26.)  Despite her earlier request for both writer's and publisher's shares, DeSalvo only

discussed Goosehock's publishing interest in this e-mail. (See id.) DeSalvo stated that Goosehock's "25% interest in the composition [is] based upon George Clinton's introductory rap of new material that he put into ['Can't C Me']." (Id.) She further asserted that Conway acknowledged that a sample of "(Not Just) Knee Deep" was contained in "Can't C Me," but that George Clinton "didn't put it in there." (Id.)

In the final correspondence of July 12, 2005, DeSalvo stated that the Plaintiffs "did not designate an expert [ ] because there was no disagreement that the work ['(Not Just) Knee Deep'] was used." (Id.) DeSalvo stated further that Harrison's "letter is now the very first that we have heard that the use is 'almost indecipherable.'" (Id.)

On July 15, 2005, DeSalvo e-mailed Harrison, first reiterating her statements from July 12, 2005. (Id. at 27.) She then stated that the Plaintiffs were "still willing to compromise on this and ask for 25% publishing share." (Id.)

After some other irrelevant correspondence and a follow-up e-mail by DeSalvo, on August 11, 2005, Harrison wrote, "[t]his is acceptable. I'm waiting to hear back from my clients." (Id. at 32.) On August 18, 2005, Harrison wrote a settlement offer to DeSalvo by e-mail and U.S. mail. (Id. at 34.) Harrison stated that his clients would "agree to a dismissal of this case with prejudice and waive any claim to attorneys' fees." (Id.)

8

Harrison then reiterated that he believed he had a strong defense in this case based on the four points in his July 12, 2005 letter. (Id.)

DeSalvo responded on August 23, 2005 by facsimile and e-mail. She stated that "we will agree to the dismissal of this case with each side to bear its own fees and costs." (Id. at 35.)

C. Negotiations Surrounding Case No. 3:01-0991

In his July 12, 2005 letter and e-mail, Harrison asserted that, with regard to Case No. 3:01-0991, a "statute of limitations claim would warrant the granting of summary judgment," as the only release of the song "Martial Law" was in 1993. (Case No. 3:01-0991, Docket Entry No. 97 at 24.) Therefore, Harrison stated that, for that case, his "clients reject[ed] the settlement proposal set forth in [DeSalvo's] e-mail of June 30." (Id.)

In her first e-mail of July 12, 2005, DeSalvo admitted that Conway had told her that there may be a statute of limitations problem, but asserted that Conway did not dispute that there were interpolations of one of Bridgeport's songs in "Martial Law." (Id. at 28.)

In her July 15, 2005 e-mail DeSalvo stated that Bridgeport and Southfield would be "willing to dismiss [Case No. 3:01-0991 for 'Martial Law'] with each side to bear its own attorneys' fees

9

and costs." (Id. at 29.)

In Harrison's August 18, 2005 letter, he stated that his clients would agree to dismissal with prejudice and would agree to refrain from seeking any costs or attorneys' fees. (Id. at 35.) Harrison went on to say that because of the statute of limitations defense that he believed to be applicable, "the waiver of attorneys' fees in this case should be of value to your client." (Id.)

DeSalvo's August 23, 2005 e-mail and facsimile stated that the Plaintiffs would "agree to the dismissal; however, if 'Martial Law' is re-released or commercially exploited by any person or entity, Plaintiffs may pursue all remedies available to them to protect their interests." (Id. at 37.)

D.  Negotiations Surrounding Case No. 3:01-0992

In his July 12 letter, Harrison contended that "the only thing in ['Mathematics'] from '[The] Humpty Dance' is a drum beat from a composition entitled 'Let's Play House' that was in turn sampled in '[The] Humpty Dance.'" (Case No. 3:01-0992, Docket Entry No. 83 at 25.) Harrison asserted that "[t]his usage does not warrant a 50% publisher share" nor "a 50% writer's share." (Id.) Therefore, Harrison stated that his "clients [had] authorized [him] to offer Bridgeport an 11% publisher's share for use of the drum beat from '[The] Humpty Dance,' and also a corresponding writer's share of 11%." (Id.) Harrison stated

10

that "[t]he provision of these interests [would] be in exchange for a full and complete release of all claims and a dismissal with prejudice of all pending cases." (Id.)

In her July 15, 2005 e-mail, DeSalvo stated that Bridgeport was "willing to accept 11.00% percent publishing share for Bridgeport only." (Id. at 29.) She continued, "[i]t cannot be on a Most Favored Nations basis as it would reduce the share to a meaningless amount." (Id.)

In his August 18, 2005 letter, Harrison offered that the Defendants would give an "11% publishing share for Bridgeport" in the song "Mathematics," to settle Case No. 3:01-0992. (Id. at 35.) Harrison further stated that his clients would "agree to the dismissal of this action with prejudice, with all parties bearing their own attorneys' fees and costs." (Id.)

In her August 23, 2005 e-mail and facsimile, DeSalvo stated that "we agree that your client will assign to Bridgeport an 11.11% interest with each side to bear its own fees and costs." (Id. at 37.) She then stated that "[t]ypically, the split for the recognition of a sample has to be on a most favored nations' basis when Bridgeport does not own 100% of the song, as it does not here." (Id.) DeSalvo finally stated, "to be accurate, the share has to be 11.11% to Bridgeport and an equal share to the writers: George Clinton at 5.56% and Walter Morrison at 5.55%." (Id.) DeSalvo ended her discussion of Case No. 3:01-0992, by

11

stating "[w]e can accomplish this though a simple assignment."

### E. The Close of Negotiations

Harrison responded on August 31, 2005 by e-mail, stating, "[w]e have an agreement. Please send me the proposed orders. Do you want to draft the agreements and releases?" (Case No. 3:01-0758, Docket Entry No. 124 at 1; Case No. 3:01-0991, Docket Entry No. 97 at 40; Case No. 3:01-0992, Docket Entry No. 83 at 40.) On September 1, 2005, DeSalvo responded, "[t]hanks. I'll send you the paperwork." (Case No. 3:01-0758, Docket Entry No. 124 at 2; Case No. 3:01-0991, Docket Entry No. 97 at 41; Case No. 3:01-0992, Docket Entry No. 83 at 41.)

### F. Post-Agreement Correspondence

On September 12, 2005, the parties submitted an "AGREED ORDER OF DISMISSAL," signed by Plaintiffs' lead attorney Richard S. Busch and Harrison. (Case No. 3:01-0758, Docket Entry No. 88, Attach. 1; Case No. 3:01-0991, Docket Entry No. 62, Attach. 1; Case No. 3:01-0992, Docket Entry No. 54, Attach. 1.) That same day, Judge Campbell entered an order of dismissal in all three matters. (Case No. 3:01-0758, Docket Entry No. 89; Case No. 3:01-0991, Docket Entry No. 63; Case No. 3:01-992, Docket Entry No. 55.)

Unfortunately, this dismissal was not the end of the story.

In DeSalvo's and Harrison's subsequent correspondence, a conflict arose regarding the nature of the "11.11% share" in

12

"Mathematics" which was to be assigned to Bridgeport in Case No. 3:01-0992. On October 25, 2005, Harrison sent DeSalvo a document titled "ASSIGNMENT OF SONG PUBLISHING ROYALTY INCOME." (Case No. 3:01-0992, Docket Entry No. 85 at 41-44.) This document was drafted by Neely, an out-of-state attorney who did not make a formal appearance for some time. (<u>Id.</u>) DeSalvo responded that "[t]he agreement is to assign an 11.11% copyright interest, not income participation. This assignment is unacceptable." (<u>Id.</u> at 23.)

Neely then drafted a document titled "ASSIGNMENT OF SONG PUBLISHING COPYRIGHT," which Harrison forwarded to DeSalvo on November 17, 2005. (<u>Id.</u> at 49-51.) DeSalvo responded on November 17, 2005 that this was still not an appropriate document because "[t]he agreement is for writer and publisher shares," and referenced her August 23, 2005 letter for the writer splits. (<u>Id.</u> at 49.) DeSalvo then stated that the publisher share of 11.11% should be on a most favored nations basis among the publishers of "The Humpty Dance," and that she would get the correct publisher split from Bridgeport to Harrison the next morning. (<u>Id.</u>)

For some reason, DeSalvo wrote Neely on December 14, 2005 requesting publishing splits on "Martial Law," which is involved in Case No. 3:01-0991. (Case No. 3:01-0991, Docket Entry No. 101 at 23-24.) Neely responded with the appropriate splits on

13

December 16, 2005.  (Id. at 22-23.)

However, on December 16, 2005, before Neely responded, DeSalvo sent two other e-mails.  The first was to Neely with a "CC" to Harrison, and included an attachment titled "QUITCLAIM ASSIGNMENT," which related to "Mathematics."  (Case No. 3:01-0992, Docket Entry No. 83 at 53-55.)  This document would transfer an 11.11% writer's copyright ownership interest (5.56% to George Clinton, Jr. and 5.55% to Walter Morrison) and an 11.11% publisher's copyright ownership interest to Bridgeport for the use of the sample from "The Humpty Dance" in "Mathematics." (Id. at 54.)

In a second e-mail on December 16, 2005, DeSalvo sent Harrison a release, which she called a "short version settlement agreement."  (Id. at 56.)  The last line of DeSalvo's e-mail stated that Bridgeport had "not approved this final version so [DeSalvo] reserve[d] the right to make changes, if necessary." (Id.)  This release addressed all three cases which are the subject of the motions at bar, with the provision that if "'Martial Law' is re-released or commercially exploited by any person or entity on or after May 4, 2001," Bridgeport "may pursue all remedies available to them against the Clinton Releasees." (Id., Docket Entry No. 87 at 28-29.)

On December 20, 2005, DeSalvo withdrew the December 16, 2005 release document "because it [did] not contain a provision

14

regarding the assignment of the copyright" for Case No. 3:01-0992. (<u>Id.</u>, Docket Entry No. 83 at 57.)

On January 11, 2006, DeSalvo sent, by e-mail and U.S. mail, a revised release and a copy of the "QUITCLAIM ASSIGNMENT" originally proffered on December 16, 2005. (<u>Id.</u> at 58, 15-18.) This version of the release included a paragraph stating, "Tick Free Music will, and hereby does, assign an 11.11% interest (publisher and writers' shares) in the copyright in and to the musical composition 'Mathematics' to Plaintiff Bridgeport Music Inc. on a most favored nations basis." (<u>Id.</u> at 47.) The release also required Tick Free to sign the quitclaim assignment. (<u>Id.</u>)

On February 10, 2006, Neely sent an e-mail with an attachment giving "a summary of [Defendants'] positions consistent with the release sent from [DeSalvo] to [ ] Harrison" on December 16, 2005. (<u>Id.</u> at 68, 64-65.) This attachment stated that the Defendants would agree to a dismissal with prejudice in all three suits and would waive any claim for attorneys' fees in each. (<u>Id.</u> at 64-65.) Another attachment was a copy of the December 16, 2005 release. (<u>Id.</u> at 66.) However, this release and Neely's summary of his clients' positions left out any discussion of a transfer of interest in the work "Mathematics," involved in Case No. 3:01-0992, but did state that an interest in "The Humpty Dance" had been previously transferred to Rubber Band Music, which is owned by George Clinton and

15

William "Bootsy" Collins.  (<u>See</u> <u>id.</u> at 64-67.)

DeSalvo responded by e-mail on February 11, 2006, stating, "[y]our client already agreed to transfer 11.11% interest in ['Mathematics'] to Bridgeport through his attorney Ben Harrison, and did so in writing." (<u>Id.</u> at 68.)  She further insisted that she was "NOT renegotiating this deal...." (<u>Id.</u>)

On February 28, 2006, Plaintiffs filed a Motion to Reopen Case in each of these three matters.  (Case No. 3:01-0758, Docket Entry No. 99; Case No. 3:01-0991, Docket Entry No. 78; Case No. 3:01-0992, Docket Entry No. 64.)

Finally, on April 21, 2006, Plaintiffs filed a Motion to Enforce Settlement Agreement in each of these three cases, which are now under consideration.  (Case No. 3:01-0758, Docket Entry No. 121; Case No. 3:01-0991, Docket Entry No. 95; Case No. 3:01-0992, Docket Entry No. 81.)

### III.  CONCLUSIONS OF LAW

"It is well established that courts retain the inherent power to enforce agreements entered into in settlement of litigation pending before them." <u>Aro Corp. v. Allied Witan Co.</u>, 531 F.2d 1368, 1371 (6th Cir. 1976) (citing <u>Kukla v. Nat'l Distillers Prods. Co.</u>, 483 F.2d 619 (6th Cir. 1973); <u>All States Investors, Inc. v. Bankers Bond Co.</u>, 343 F.2d 618 (6th Cir. 1965)).  "A federal court possesses this power 'even if that agreement has not been reduced to writing.'" <u>Brock v. Scheuner</u>

16

<u>Corp.</u>, 841 F.2d 151, 154 (6th Cir. 1988) (quoting <u>Bowater N. Am.</u>
<u>Corp. v. Murray Mach., Inc.</u>, 773 F.2d 71, 77 (6th Cir. 1985)).

Because a settlement agreement is a contract, this Court
must consider the substantive contract law of the state of
Tennessee in determining whether to enforce the settlement
agreement. <u>Bamerilease Capital Corp. v. Nearburg</u>, 958 F.2d 150,
152 (6th Cir. 1992) (citing <u>White Farm Equip. Co. v. Kupcho</u>, 792
F.2d 526, 529 (5th Cir. 1986). In the state of Tennessee,
"[w]hile a contract may be either expressed or implied, or
written or oral, it must result from a meeting of the minds of
the parties in mutual assent to the terms, must be based upon a
sufficient consideration, ...and [must be] sufficiently definite
to be enforced." <u>Johnson v. Central Nat'l Ins. Co.</u>, 210 Tenn.
24, 34-35 (1962); <u>see also</u> <u>Higgins v. Oil, Chem. & Atomic Workers</u>
<u>Int'l Union</u>, 81 S.W.2d 875, 879 (Tenn. 1991). "The contemplated
mutual assent and meeting of the minds cannot be ... accomplished
by an ambiguous course of dealing between the parties from which
differing inferences regarding continuation or modification of
the original contract might reasonably be drawn." <u>Jamestowne on</u>
<u>Signal, Inc. v. First Fed. Savings & Loan Assoc.</u>, 807 S.W.2d 559,
564 (Tenn. App. 1990) (citing <u>Batson v. Pleasant View Utility</u>
<u>Dist.</u>, 592 S.W.2d 578, 582 (Tenn. App. 1979); <u>Balderacchi v.</u>
<u>Ruth</u>, 36 Tenn. App. 421 (1953)). At oral argument, the parties
made it clear that they do not dispute that attorneys have the

17

right to enter into agreements on behalf of their clients.

A.   <u>Enforceability of the Settlement Agreement in Case No. 3:01-0758</u>

After nearly three months of negotiations, Harrison made an offer in his August 18, 2005 e-mail to dismiss Case No. 3:01-0758 regarding the use of "(Not Just) Knee Deep" in "Can't C Me." This offer stated that Stephanie Clinton d/b/a Goosehock would "agree to a dismissal of this case with prejudice and waive any claim to attorneys' fees." (Case No. 3:01-0758, Docket Entry No. 123 at 34.)  This offer was only changed slightly by the omission of the phrase "with prejudice" when DeSalvo wrote back with her counteroffer on August 23, 2005, stating that Bridgeport would "agree to the dismissal of this case with each side to bear its own fees and costs."  (Id. at 35.)  This counteroffer was accepted by Harrison's August 31, 2005 e-mail, in which he stated, "[w]e have an agreement."  (Id., Docket Entry No. 124 at 1.)

There existed an earlier controversy over whether Bridgeport should be entitled to a publisher's or writer's share in "Can't C Me." However, the long course of communication leading up to two substantially similar statements related to the agreement shows mutual assent to the terms of the agreement.

The consideration in this agreement is very straightforward. Stephanie Clinton d/b/a Goosehock promised to give up her right

18

to sue for fees and costs in exchange for Bridgeport's promise to cease the litigation with respect to the use of "(Not Just) Knee Deep" in "Can't C Me."

The terms of this agreement are very clear and definite, and should be enforced as follows: Case No. 3:01-0758 should be dismissed with prejudice[5] with both parties to refrain from seeking fees or costs associated with the litigation of Case No. 3:01-0758.

For the foregoing reasons, the Court should **GRANT** Plaintiff's motion to enforce the settlement agreement in Case No. 3:01-0758.

B.  <u>Enforceability of the Settlement Agreement in Case No. 3:01-0991</u>

The agreement in Case No. 3:01-0991 is also quite straightforward.  DeSalvo acknowledged as early as July 12, 2005 that she was aware that there may be a statute of limitations problem with Bridgeport's and Southfield's claim against George Clinton d/b/a Exoskeletal for digital samples used in the song "Martial Law."  (Case No. 3:01-0991, Docket Entry No. 97 at 28.)

---

[5]The Agreed Order of Dismissal stated that the dismissal was to be "without prejudice," but would "become with prejudice forty-five (45) days after the entry" of the Order, "subject to the right to reopen this action within forty-five (45) days if settlement is not consummated."  (Case No. 3:01-0758, Docket Entry No. 89.)  It is clear from this language that to give effect to the intent of the parties, the Court, in enforcing the settlement agreement, should require the dismissal to be with prejudice.

19

On July 15, 2005, DeSalvo stated that Bridgeport and Southfield would be "willing to dismiss [Case No. 3:01-0991] with each side to bear its own attorneys' fees and costs." (Id. at 29.) On August 18, 2005, Harrison agreed to DeSalvo's proposal, and plainly spelled out the consideration, by stating that because of the probable statute of limitations defense, "the waiver of attorneys' fees in this case should be of value to your client." (Id. at 35.) Even though the parties were in agreement at this point, they were still negotiating the other agreements. As such, there was no manifestation of an intent to be bound (and thus, no offer) until this August 18 letter. (See id. at 29-36.)

DeSalvo rejected the offer in Harrison's August 18, 2005 letter and made a counteroffer by adding a term in her August 23, 2005 letter, which stated that "if 'Martial Law' is re-released or commercially exploited by any person or entity, Plaintiffs may pursue all remedies available to them to protect their interests." (Id. at 37.)

This was, again, accepted by Harrison's simple e-mail, "[w]e have an agreement," on August 31, 2005. (Id. at 40.) The consideration here, as Harrison stated, is George Clinton d/b/a Exoskeletal's promise to refrain from seeking attorneys' fees in exchange for Bridgeport's promise to dismiss the pending litigation with regard to Case No. 3:01-0991.

Like Case No. 3:01-0758, the terms of the agreement are very

20

clear and definite, and should be enforced as follows: Case No.
3:01-0991 should be dismissed with prejudice with both parties to
refrain from seeking fees and costs associated with the
litigation of Case No. 3:01-0991.  However, should "Martial Law"
be re-released or commercially exploited by any person or entity,
Bridgeport and Southfield retain their right to pursue all
remedies available to them to protect their interests.

For the foregoing reasons, the Court should **GRANT**
Plaintiff's motion to enforce the settlement agreement in Case
No. 3:01-0991.

C.  <u>Enforceability of the Settlement Agreement in Case No. 3:01-</u>
<u>0992</u>

1.  *The meaning of "share" or "interest"*

Very early on in the negotiations, the parties began
speaking about the assignment of a "share" or "interest" in the
song "Mathematics" to Bridgeport in consideration of Bridgeport's
dismissal of Case No. 3:01-0992 for copyright infringement of
"The Humpty Dance."  In Harrison's July 12 letter, he stated that
George Clinton d/b/a Exoskeletal and Tick Free authorized him to
"offer Bridgeport an <u>11% publisher's share</u> for use of the drum
beat from '[The] Humpty Dance,' and also a corresponding <u>writer's</u>
<u>share of 11%</u>." (Case No. 3:01-0992, Docket Entry No. 83 at 25
(emphasis added).)

The next two correspondences (DeSalvo's July 15, 2005 e-mail

21

and Harrison's August 8, 2005 letter) seemed to place the parties on the same page with an "<u>11% publishing share</u> for Bridgeport." (<u>See</u> <u>id.</u> at 29, 35 (emphasis added).) In neither of these correspondences was a writer's share discussed. (<u>See</u> <u>id.</u>)

DeSalvo's August 23, 2005 e-mail, however, reinstated the discussion of the writer's share, as she stated, "we agree that your client will assign to Bridgeport an <u>11.11% interest</u> with each side to bear its own fees and costs." (<u>Id.</u> at 37 (emphasis added).) The offer then stated, "to be accurate, the share has to be <u>11.11% to Bridgeport</u> and an <u>equal share to the writers</u>: George Clinton at 5.56% and Walter Morrison at 5.55%." (<u>Id.</u> (emphasis added).)

Despite the possible confusion and the Defendants' later assertion that the parties attached materially different meanings to the terms, Harrison accepted this offer with his August 31, 2005 e-mail, "[w]e have an agreement." (<u>Id.</u> at 40.)

George Clinton d/b/a Exoskeletal and Tick Free argue that there was no "meeting of the minds," and therefore no mutual assent, because they believed the agreement to be for an assignment of publishing royalty income, whereas Bridgeport understood the agreement to be an assignment of copyright ownership interest. (<u>Id.</u>, Docket Entry No. 84 at 5-10.)

In determining whether there has been a mutual assent, the subjective intent of the parties is to be determined by

22

objectively interpreting the parties' manifestations of intent. Staubach Retail Servs.-Se., LLC v. H.G. Hill Realty Co., 160 S.W.3d 521, 524 (Tenn. 2005). Black's Law Dictionary defines "share" as "[a]n allotted portion owned by, contributed by, or due someone." Black's Law Dictionary 1380 (7th Ed. 1999). Black's Law Dictionary defines "interest" as "[a] legal share in something; all or part of a legal or equitable claim to or right in property." Id. at 816. The legal definition of "interest" uses the term "share." The legal definition of "share" is susceptible of both parties' interpretations. In fact, the exemplary sentence contained in Black's Law Dictionary--"each partner's share of the profits"--could favor either party's purported meaning, as "partner's share" has an ownership connotation, but "share of the profits" has an income connotation. Id. at 1380.

At oral argument, DeSalvo claimed that the parties had a course of dealing from the settlement of Case No. 3:01-1134, in which a copyright ownership interest was transferred using language similar to that used in the case at bar. This may be a useful tool in ascertaining the intent of the parties; however, DeSalvo submitted no evidence to support this claim, and it, therefore, will not be considered.

Harrison's declaration states that he is "a trial lawyer with no particular expertise in intellectual property law outside

23

the scope of litigation." (Case No. 3:01-0992, Docket Entry No. 85 at 1.) As such, he may not understand the implications of a transfer of copyright ownership interest versus a transfer of a royalty income stream. Be that as it may, his subsequent actions show that the transfer of a copyright ownership interest was within his understanding of the agreement. He instructed Neely to draft, and on November 17, 2005 forwarded to DeSalvo, the "ASSIGNMENT OF SONG PUBLISHING COPYRIGHT." (<u>Id.</u>, Docket Entry No. 83 at 50-51.) Accordingly, though the terms "interest" and "share" may be reasonably susceptible to more than one meaning, Harrison's replacement of the "ASSIGNMENT OF SONG PUBLISHING ROYALTY INCOME" with the "ASSIGNMENT OF SONG PUBLISHING COPYRIGHT" at DeSalvo's request, and without disagreement, shows that he understood the transfer to be one of an ownership interest. The argument of lack of mutual assent must, therefore, fail.

2. *The Significance of a "Most Favored Nations" Clause*

At oral argument, DeSalvo argued that the discussion of the "most favored nations" clause showed that the parties intended for the agreement to embody a transfer of copyright ownership. DeSalvo argued that a "most favored nations" clause is irrelevant to income participation.

A "most favored nations" clause can arise in a variety of contexts; however, with regard to music publishing, it

24

"guarantees that if another publisher or song receives a better [royalty] rate, [the publisher with the 'most favored nations' clause] will also get the benefit of such a rate." Jeffrey Brabec[6] & Todd Brabec[7], <u>Music, Money, and Success</u> 40 (3d ed. 2002) (1994). "The concept can also apply to all terms of a license if so negotiated by the parties." <u>Id.</u>

"Most favored nations" clauses arise most often in licenses for use of a song in a medley, licenses for use of a song in a "question-and-answer trivia game," licenses for use of a song in a "special products album" (such as a "best of the 80s" or "greatest hits" album), licenses for use of a song in a promotional television program (to promote a film), and free or nominal licenses to use a song in a nonprofit film. <u>See</u> <u>id.</u> at 40, 42, 49, 184-85. Accordingly, and contrary to DeSalvo's argument, "most favored nations" clauses are typically used in exclusive and non-exclusive licenses to use a copyrighted work.

Therefore, the inclusion of a "most favored nations" clause in these settlement discussions actually favors the interpretation that the negotiations were for an income interest. Accordingly, the "most favored nations" clause in this context

---

[6]Jeffrey Brabec is the Vice President of Business Affairs for the Chrysalis Music Group.

[7]Todd Brabec is the current chair of the American Bar Association's Forum on Entertainment and Sports Committees and is the Executive Vice President of Membership for the American Society of Composers, Authors and Publishers (ASCAP).

would mean that Bridgeport would grant George Clinton d/b/a Exoskeletal and Tick Free a license to use "The Humpty Dance" in "Mathematics" in exchange for 11.11% of the income from "Mathematics." Thereafter, if George Clinton d/b/a Exoskeletal and Tick Free gave any co-publisher of "The Humpty Dance" more than 11.11% income from the sales of "Mathematics," George Clinton d/b/a Exoskeletal and Tick Free would have to give Bridgeport an equivalent share.

However, DeSalvo's argument is not without merit. Bridgeport shares a co-publishing interest in "The Humpty Dance." Therefore, in this context, a most favored nations clause could be read to mean that if George Clinton d/b/a Exoskeletal and Tick Free gave any other co-publisher of "The Humpty Dance" a copyright ownership interest greater than 11.11%, Bridgeport's ownership interest must be correspondingly increased.

Furthermore, the discussion of a "most favored nations" clause could show that there was no mutual assent. In all of the settlement discussions, Harrison did not refer to a "most favored nations" clause a single time. Conversely, DeSalvo addressed a "most favored nations" clause in three of her correspondences, but had a different request each time. First, in her June 28, 2005 e-mail, DeSalvo requested a "50% publishing share (writer and publisher) on a [most favored nations] basis." (Case No. 3:01-0992, Docket Entry No. 83 at 19.) Then, in her July 15,

26

2005 e-mail, DeSalvo stated that the "publishing share" could not "be on a Most Favored Nations basis as it would reduce the share to a meaningless amount." (Id. at 29.) Finally, in her August 23, 2005 offer, DeSalvo made an ambiguous blanket statement that "[t]ypically, the split for the recognition of a sample has to be on a most favored nations' basis when Bridgeport does not own 100% of the song, as it does not here." (Id. at 37.)

Though the susceptibility of the "most favored nations" clause to multiple interpretations could, alone, show a lack of mutual assent, when combined with Harrison's later actions discussed in Section III(C)(1), the intent of the parties becomes clearer. The parties in all likelihood assented to the transfer of a 11.11% copyright ownership interest in both the publisher's and writer's shares. A most favored nations clause is not a part of the agreement because DeSalvo's offer made no specific request with regard to such a clause. All that the offer stated was "[t]ypically, the split for the recognition of a sample has to be on a most favored nations' basis when Bridgeport does not own 100% of the song, as it does not here." (Id. (emphasis added).)

Were this the only issue, the Magistrate Judge would likely find an agreement. However, as discussed in the following section, even if there was an agreement, it would not be valid.

The amount of time spent litigating and relitigating this issue points out the failure of the attorneys to communicate with

each other and with their clients directly. In short, e-mails do not get the job done.

A real conversation either by phone or face to face would have resolved this matter at an early stage. The Magistrate Judge is frankly dismayed at the reluctance of the attorneys and parties to actively talk to each other. George Clinton's opposition to any transfer of ownership should have been resolved by his attorney early on and conveyed to Bridgeport in clear language.

Likewise, the fact that Bridgeport demanded an ownership interest rather than an income stream should have been made clear.

Unfortunately, the carelessness of attorneys on both sides has greatly increased the expense to the parties and wasted a lot of the Court's time.

### 3. *The Implications of 17 U.S.C. § 204(a)*

Even if the parties assented to the transfer of an 11.11% copyright ownership interest, the Copyright Act renders the agreement invalid. Section 204(a) of Title 17 of the United States Code states that "[a] transfer of copyright ownership, other than by operation of law, is not valid unless an instrument of conveyance, or a note or memorandum of the transfer, is in writing and signed by the owner of the rights conveyed or such owner's duly authorized agent." 17 U.S.C.A. § 204(a) (2005).

28

Furthermore, courts have held that § 204(a) also bars a claim for breach of a contract to transfer copyright ownership where the requirements of § 204(a) have not been met. <u>Valente-Kritzer Video v. Pinckney</u>, 881 F.2d 772, 774 (9th Cir. 1989) (citing <u>Liberty Publ'ns, Inc. v. Med. Econs. Co.</u>, 548 F. Supp. 1231, 1233 (E.D. Pa. 1982), <u>aff'd</u>, 714 F.2d 123 (3d Cir. 1983)); <u>Time, Inc. v. Kastner</u>, 972 F. Supp. 236, 238-39 (S.D.N.Y. 1997).

§ 204(a) is commonly referred to as the "copyright statute of frauds." However, this is somewhat misleading. The statute of frauds serves an evidentiary function by making otherwise valid agreements unenforceable, whereas "under § 204(a), 'a transfer of copyright is simply not valid without a writing.'" <u>Lyrick Studios, Inc. v. Big Idea Prods., Inc.</u>, 420 F.3d 388, 391-92 (5th Cir. 2005) (quoting <u>Konigsberg Int'l, Inc. v. Rice</u>, 16 F.3d 355, 357 (9th Cir. 1994)). Still, if an agreement to transfer copyright ownership is later confirmed in a writing which complies with § 204(a), the transfer is valid. <u>Eden Toys, Inc. v. Florelee Undergarment Co.</u>, 697 F.2d 27, 36 (2d Cir. 1982), <u>superseded by statute on other grounds</u>, Fed. R. Civ. P. 52(a) (1985), <u>as recognized in</u> <u>Weissmann v. Freeman</u>, 868 F.2d 1313, 1322 (2d Cir. 1989).

There are three basic policy reasons for § 204(a): (1) to prevent inadvertent transfers of copyright ownership, (2) to force "a party who wants to use the copyrighted work to negotiate

29

with the creator to determine precisely what rights are being transferred and at what price," and (3) to provide a guide for resolving disputes.  <u>Effects Associates, Inc. v. Cohen</u>, 908 F.2d 555, 557 (9th Cir. 1990).  "Most importantly, section 204 enhances predictability and certainty of copyright ownership--'Congress' paramount goal' when it revised the Act in 1976."  <u>Id.</u> (quoting <u>Cmty. For Creative Non-Violence v. Reid</u>, 490 U.S. 730, 749, 109 S. Ct. 2166, 2178, 104 L. Ed. 2d 811 (1989)).

Here, though there was no satisfactory writing at the time of the August 31, 2005 agreement, under <u>Eden Toys</u>, the writing requirement of § 204(a) could be satisfied with DeSalvo's "QUITCLAIM ASSIGNMENT" of December 16, 2005.[8]  (<u>See</u> Case No.

---

[8]It bears mention that DeWayne McKnight d/b/a DeWKnight Music ("DeWKnight") owns 50% of the copyright (both writer's and publisher's shares) in "Mathematics."  DeWKnight is listed as the assignor of 5.56% of the negotiated 11.11% publisher's share (subject to the varying interpretations therein, with Tick Free assigning the remaining 5.55% publisher's share) in the October 25, 2005 "ASSIGNMENT OF SONG PUBLISHING ROYALTY INCOME," the November 17, 2005 "ASSIGNMENT OF SONG PUBLISHING COPYRIGHT," and the December 16, 2005 "QUITCLAIM ASSIGNMENT."  DeWayne McKnight is also listed as the assignor of a 5.56% writer's copyright ownership interest in the December 16, 2005 "QUITCLAIM ASSIGNMENT" (with George Clinton assigning the remaining 5.55% share).  Neither DeWayne McKnight nor DeWKnight is joined as a party to Case No. 3:01-0992 and, were the Court to determine that the settlement agreement is valid, the decision could not bind either.  In attempting to enforce the agreement against DeWayne McKnight d/b/a DeWKnight, Bridgeport may not be able to show that there existed valid consideration.  However, if this recommendation is approved, the inclusion the names DeWayne McKnight and DeWKnight on the documents has no effect on the outcome of this Motion.  In any event, for the reasons stated in the discussion of 17 U.S.C. § 204(a), DeWayne McKnight could not be compelled to sign the "QUITCLAIM ASSIGNMENT."

3:01-0992, Docket Entry No. 83 at 54.)  This is a writing which,
as DeSalvo noted in oral argument, is "crystal clear" and
embodies the agreement for which Bridgeport argues.  (See id.)
However, the statute is quite explicit that a transfer of
ownership in a copyright must be signed by the owner of the
copyright or his duly authorized agent.  See § 204(a).
Bridgeport does not dispute that no signed copy of this document
exists, but rather asks the Court to compel George Clinton d/b/a
Exoskeletal and Tick Free to sign the "QUITCLAIM ASSIGNMENT."

For this proposition, Valente-Kritzer Video, provides
guidance.  In Valente-Kritzer Video, Pinckney was the author of a
best-selling book.  881 F.2d at 773.  The plaintiff alleged that
it entered into an oral agreement with Pinckney whereby it (1)
was given the exclusive right to negotiate production and
distribution of a home video based on the book, (2) was given the
promise that if Valente-Kritzer Video found a producer, Pinckney
would transfer the right to co-produce, distribute, and sell the
videocassette to Valente-Kritzer Video, and (3) was given an
equal share of the royalty stream with Pinckney.  Id.  Pursuant
to the alleged agreement, Valente-Kritzer Video secured MCA Home
Video to produce the video.  Id.  However, Pinckney refused to
perform, and ultimately secured a deal with MCA directly to
produce the videocassette.  Id. at 773-74.  The Ninth Circuit
held that, because producing a videocassette of a book is the

31

production of a derivative work, which is one of the six
exclusive rights comprised in a copyright, § 204(a) barred the
oral contract from transferring that right.  Id. at 774. The
court further stated that Pinckney's attorney "alone could not
memorialize the agreement between the parties even if he intended
to do so, absent Pinckney's signature on the latter or some
express authorization from her."  Id. at 775 (emphasis added).

Lyrick Studios is also on point.  Lyrick Studios negotiated
to distribute VeggieTales, a Christian-themed children's cartoon
owned by Big Idea.  Lyrick Studios, 420 F.3d at 390.  The parties
negotiated and sent draft contracts back and forth for thirteen
months.  Id.  The first of Lyrick Studios' faxes stated "no
contract will exist until both parties have executed a formal
agreement."  Id.  After these thirteen months of negotiations,
and despite lacking a formal signed contract, Lyrick Studios
began distributing VeggieTales videocassettes.  Id. at 391.
Approximately three and a half years later, and after Lyrick
Studios had been acquired by another company, Big Idea informed
Lyrick Studios that it was going to use a new distributor.  Id.
The Fifth Circuit stated that § 204(a) "requires some language of
finality," which could not be found in the correspondences
between Lyrick Studios and Big Idea.  Id. at 393, 396.  The court
held that the "preliminary faxes [which] indicated that a
contract would be entered into but did not provide a final

32

contract [and] an internal memo, never intended to be given to the other party, [which] described some of the terms" were insufficient to satisfy the requirements of § 204(a). Id. at 395-96.

Though attorneys typically have the power to enter binding agreements on behalf of their clients, Valente-Kritzer Video shows a tendency of courts to be very strict on the requirements of § 204(a). Therefore, though DeSalvo and Harrison likely assented to the transfer of copyright ownership, without George Clinton's signature on the agreement, the Court must treat the agreement as if it never existed. Under Valente-Kritzer Video, absent express authorization, Harrison's position as the attorney for George Clinton d/b/a Exoskeletal and Tick Free did not give him the authority to enter into an agreement to transfer copyright ownership in "Mathematics" on his clients' behalf. Furthermore, the Court does not have the power to compel George Clinton to sign the agreement because a purported transfer of copyright ownership which does not comply with § 204(a) is "simply not valid." Lyrick Studios, 420 F.3d at 392.

Alternatively, the December 16, 2005 "QUITCLAIM ASSIGNMENT" manifests the "language of finality" required by § 204(a). Lyrick Studios, 420 F.3d at 393. However, DeSalvo sent an e-mail to Harrison two hours after sending the "QUITCLAIM ASSIGNMENT," with a release that was to be the consideration for the

assignment. (Case No. 3:01-0992, Docket Entry No. 83 at 56.) In this e-mail, DeSalvo stated that she "reserve[d] the right to make changes, if necessary." (Id.) This is very similar in effect to the language in Lyrick Studios that "no contract will exist until both parties have executed a formal agreement." Lyrick Studios, 420 F.3d at 390. As in Lyrick Studios, the mere fact that both parties manifested an intent to enter into a contract is simply not enough to create an agreement in compliance with § 204(a). DeSalvo's reservation of her right to alter the release discounts the language of finality of the "QUITCLAIM ASSIGNMENT" itself.

Because the agreement to transfer a copyright ownership interest in the song "Mathematics" does not comply with § 204(a), the Court should **DENY** Plaintiff's motion to enforce the settlement agreement in Case No. 3:01-0992.

If this recommendation is approved, this case should be reopened and set for trial.

### D.  Plaintiffs' Request for Attorneys' Fees

In their memorandum of law, Bridgeport and Southfield request compensation for "additional legal expenses in responding to Clinton's dilatory tactics, and wholly unjustified conduct." (Case No. 3:01-0758, Docket Entry No. 122 at 8; Case No. 3:01-0991, Docket Entry No. 96 at 8; Case No. 3:01-0992, Docket Entry No. 82 at 8.) Bridgeport and Southfield cite to various cases

34

which authorize a court to award fees for bad faith or attempts to delay and obstruct final resolution of an action. <u>Jones v. Continental Corp.</u>, 789 F.2d 1225, 1229 (6th Cir. 1986) (citing <u>Roadway Express, Inc. v. Piper</u>, 447 U.S. 752, 65 L. Ed. 2d 488, 100 S. Ct. 2455 (1980)); <u>Jaynes v. Austin</u>, 20 Fed. Appx. 421, 427 (6th Cir. 2001).

An agreement with regard to Case No. 3:01-0758 and Case No. 3:01-0991 was reached on August 31, 2005, and no controversy arose with regard to those cases. The only additional costs related to those cases were the costs associated with filing the Motion to Reopen Case (Case No. 3:01-0758, Docket Entry No. 64; Case No. 3:01-0991, Docket Entry No. 78) and the Motion to Enforce Settlement Agreement (Case No. 3:01-0758, Docket Entry No. 121; Case No. 3:01-0991, Docket Entry No. 95). The costs associated with filing these motions is minimal, as the motions are duplicative of those filed in Case No. 3:01-0992.

With regard to Case No. 3:01-0992, the parties likely reached an agreement, though their attorneys, on August 31, 2005 to transfer 11.11% copyright ownership of both the publisher's and the writer's shares in "Mathematics." (Case No. 3:01-0992, Docket Entry No. 83 at 37-38.) However, under § 204(a), this agreement was not valid. The delay in resolving this case was the result of two problems: (1) DeSalvo's refusal to work with Neely, an attorney experienced in drafting copyright ownership

35

assignments and (2) DeSalvo's and Harrison's frequent delays, misunderstandings, and bickering.[9]  As such, both parties (or more precisely, their attorneys) are at fault for the "delay and obstruct[ion] of final resolution" of this action.  Jones, 789 F.2d at 1229.  There is no good excuse for the attorneys in this case not to properly finalize an agreement once they have told the Court the case is settled.

Therefore, each attorney should absorb his or her own fault by paying his or her own fees and costs.  The Magistrate Judge would hope the attorneys would not charge their respective clients for their errors.

IV.  RECOMMENDATION

In light of the foregoing, the Magistrate Judge recommends that Plaintiffs' Motion to Enforce Settlement Agreement be **GRANTED** in Case No. 3:01-0758 and Case No. 3:01-0991 and be **DENIED** in Case No. 3:01-0992.  The included request for award of Plaintiffs' attorneys' fees and costs should be **DENIED** in Case No. 3:01-0758, Case No. 3:01-0991, and Case No. 3:01-0992.

The resolution of these motions requires resolution of Plaintiffs' motions to reopen the three cases.  (Case No. 3:01-0758, Docket Entry No. 99; Case No. 3:01-0991, Docket Entry No.

---

[9]An example is DeSalvo's claim that she believed Bowman Neely to be a law firm instead of an individual.  A quick search of the internet or of Martindale-Hubbell would have revealed Neely's identity.  In any event, an attorney can communicate with a law firm just as easily she can with a named attorney.

36

78; Case No. 3:01-0992, Docket Entry No. 64.)  Accordingly the Magistrate Judge recommends that Plaintiffs' Motion to Reopen Case be **DENIED** in Case No. 3:01-0758 and Case No. 3:01-0991 and **GRANTED** in Case No. 3:01-0992.  The Magistrate Judge further recommends that Case No. 3:01-0992 be set for trial at an early date.

Under Rule 72(b) of the Federal Rules of Civil Procedure, any party has ten (10) days from receipt of this Report and Recommendation in which to file any written objections to this Recommendation with the District Court.  Any party opposing said objections shall have ten (10) days from receipt of any objections filed in this Report in which to file any responses to said objections.  Failure to file specific objections within ten (10) days of receipt of this Report and Recommendation can constitute a waiver of further appeal of this Recommendation. Thomas v. Arn, 474 U.S. 140, 106 S. Ct. 466, 88 L. Ed. 2d 435 (1985), reh'g denied, 474 U.S. 1111 (1986).

**ENTERED** this  5th  day of June, 2006.

                                     /s/ Joe B. Brown
                                    JOE B. BROWN
                                    United States Magistrate Judge